**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:

                                        Chapter 11

114 TENTH AVENUE ASSOC., INC.,

                                        Case No. 05-60099 (ALG)

                         Debtor.
------------------------------------------------------------x


### MEMORANDUM OF OPINION


A P P E A R A N C E S:

SCHAFFERMAN & FELDMAN, LLP
Counsel for the Debtor
      By: Joel M. Schafferman, Esq.
350 Fifth Avenue, Suite 2723
New York, New York 10118

ADAM LEITMAN BAILEY, P.C.
Special Litigation and Real Estate Counsel for the Debtor
      By: William J. Geller, Esq.
120 Broadway, 17th Floor
New York, New York 10271

THE LAW OFFICES OF GABRIEL DEL VIRGINIA
Counsel for Karen Nason
        By: Gabriel Del Virginia, Esq.
            Yitzhak Greenberg, Esq.
488 Madison Avenue, 19th Floor
New York, New York 10022

MICHAEL T. SUCHER, ESQ.
Counsel for Carlton Capital Group and Highline Properties LLC
      By: Michael T. Sucher, Esq.
26 Court Street, Suite 2412
Brooklyn, New York 11242

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two claims objections filed by 114 Tenth Avenue Associates,

Inc. (the "Debtor").  The Debtor seeks disallowance of the claim of Karen Nason

("Nason") on the grounds, *inter alia*, that a stipulation providing for the underlying

mortgage claim is invalid and that the mortgage lacks consideration.  The Debtor also

seeks to expunge a claim filed by Carleton Capital Corp. and Carleton's assignee,

Highline Properties, LLC (collectively, "Carlton"), on grounds that the Debtor is not

liable for the fair market value of use and occupancy in connection with its possession of

114 Tenth Avenue during the period between a foreclosure sale and the closing (the "Stay

Period").  The Debtor asserts it is only liable to Carlton for the rents and profits it actually

received, less expenses of maintaining the Property, and that it is entitled to a setoff

measured by interest on the purchase price not paid during the Stay Period.  For the

reasons set forth below, the Debtor's objection to the Nason claim is overruled and its

objection to the Carleton claim is sustained in part and set down for a further hearing.

## BACKGROUND

**Facts Relating Primarily to Nason**

The Debtor's sole asset was land and a mixed-use building located at 114 Tenth

Avenue in New York City (the "Property").  When the Property was purchased in the

1990's, Nason and Zivadin Krstic ("Krstic"), the Debtor's president and sole shareholder,

were involved in a personal relationship, and on November 24, 1994, Nason gave birth to

a son, Zillian Krstic ("Zillian").

Nason contends that funds from a business she operated provided part of the

purchase price of the Property.  In return, she alleges, Krstic agreed that she would be a

50% owner of the Property and that title to the Property would be in the Debtor's name, with Nason owning 50% of the stock. Nason, however, never received any stock, and the alleged agreement was not documented. Nason alleges that she was involved in the day-to-day operations of the building and that income from the building paid her expenses and Krstic's. The Debtor in turn contends that Nason made no financial or other contribution to the Property.

The relationship between Nason and Krstic ended in 2002, at which time Krstic denied that Nason had any ownership interest or rights in the Property or the Debtor. As a result, on February 13, 2003, Nason filed an action in the Supreme Court, New York County (the "State Court"), against both Krstic and the Debtor for unjust enrichment and partition of the Property (the "Partition Action"). At that time, Nason also filed a notice of pendency asserting a one-half ownership interest in the Property. On February 28, 2003, Nason also filed an action in Family Court, New York County, against Krstic, seeking an order of paternity and child support for Zillian (the "Family Court Action").

Nason and Krstic subsequently entered into a stipulation, "so ordered" by the Family Court on November 8, 2004 (the "State Court Stipulation"), that provided for settlement of both the Family Court Action and the Partition Action. It stated, among other things:

> Respondent shall execute a will providing that Zillian shall be the beneficiary of the real property located at 457 West 17th Street, New York, N.Y. . . . and the shares of stock of 114 Tenth Avenue Association, Inc. which holds title to the Property, or any other corporation which shall hereafter hold title to such property, provided, however, that, in the event Respondent or any corporation which shall hold title to the property shall cause or permit the sale of disposition of such property to a person or entity in which or with respect to which the Respondent has no interest, prior to the Respondent's death, then Zillian shall receive the sum of $400,000 out of the proceeds of such sale or disposition. In the event, at

the time of such sale or other disposition, Zillian is under the age of 21, the payment of said $400,000 shall be made to Petitioner as Trustee for Zillian pursuant to a trust agreement . . . .

(State Court Stipulation ¶ 5).[1]  The State Court Stipulation further provided, "In order to secure the Respondent's obligation to make the payment of $400,000 as herein provided, Respondent shall execute a mortgage . . . ."  (State Court Stipulation ¶ 6).  It also stated, "Respondent shall further provide in his will that upon his death, Zillian shall receive one-third of any real property owned by Respondent individually or by a corporation in which Respondent is the majority shareholder, after payment of any mortgages on the property as of April 1, 2004."  (State Court Stipulation ¶ 7).

A mortgage was thereafter executed on November 24, 2004, between the Debtor as mortgagor and Nason, as Trustee for Zillian, as mortgagee (the "Mortgage").  Krstic signed the Mortgage, acting as President of the Debtor.  Additionally, a Trust Agreement was entered into between Krstic, as settlor, and Nason, as trustee (the "Trust Agreement"), which identified the trust property as the Mortgage that the settlor, as sole shareholder of the Debtor, confirmed he had caused the Debtor to execute for the benefit of the Trustee. (Trust Agmt. Art. 2.

.Meanwhile, in 2003, a tax lien foreclosure proceeding had been commenced against the Property in the Supreme Court, New York County, Index No. 109239/03 (the "Tax Foreclosure Action"), by the NYCTL 1999-1 Trust, a tax lien trust that had purchased a tax lien on the Property imposed by the City of New York.  A Tax Foreclosure Action was thereafter brought against the Debtor and several other defendants with asserted interests in the Property.  Nason was included as a defendant due to the notice of pendency she had filed against the Property.  Krstic asserts that he

---

[1] Zillian is currently under 21 and Nason is acting as Trustee on his behalf.

never received actual notice of the Tax Foreclosure Action and that the Debtor was

served at a former address.  The Debtor subsequently defaulted, and on October 6, 2004,

the Supreme Court issued a Judgment of Foreclosure and Sale against the Property (the

"Foreclosure Judgment").[2]  An auction sale of the Property was held on May 18, 2005, at

which Carlton was the winning bidder in the amount of $2 million ("Foreclosure Sale").

Krstic alleges that he only became aware of the Tax Foreclosure Action on the day after

the auction, when a representative of the winning bidder came to inspect the Property.

He thereafter moved, on behalf of the Debtor, to vacate the Foreclosure Judgment on due

process grounds.

On November 10, 2005, having been unable to vacate the foreclosure, the Debtor

filed a petition under Chapter 11 of the Bankruptcy Code.  The Debtors' schedules listed

Nason as a secured creditor holding a contingent, unliquidated and disputed claim in the

amount of $400,000, the basis of which was a "purported mortgage" on the Property.  On

February 8, 2009, Nason, as trustee for Zillian, filed a proof of claim against the Debtor

in the amount of $400,000.  The basis of the claim was the State Court Stipulation, plus

the costs and expenses of defending the alleged Mortgage.  Thereafter, on October 18,

2006, Nason purported to record the Mortgage.

On July 18, 2008, the Debtor commenced an adversary proceeding, Adv. No. 08-

01347, against Nason individually and as trustee of the Krstic Irrevocable Trust, and her

attorney, Kenneth Miller (the "Nason Adversary Proceeding").  The first count of the

Complaint sought a declaratory judgment that the post-petition recordation of the

---

[2] On April 23, 2004, the State Court found that Nason's lien was subordinate to the tax lien held by the NYCTL 1999-1 Trust and did not constitute a valid defense to the Tax Foreclosure Action. It struck Nason's answer to the Tax Foreclosure Action but did not otherwise adjudicate the merits of the Mortgage. (Debtor Objection to Nason Claim Ex. N).

Mortgage was in violation of the automatic stay and void; the second count sought a declaratory judgment that Nason had no valid interest in or claim against the estate; and the third count sought contempt damages for violation of the stay. After negotiations, Nason expunged the recording of the Mortgage, and the Debtor withdrew the first and third counts of the Complaint with prejudice. Nason moved for summary judgment in her favor on the second count. At a hearing held on February 26, 2009, Nason's summary judgment motion was dismissed without prejudice, the Court observing that Nason's rights, if any, could be determined in the context of an objection to her proof of claim.

## Facts Relating Primarily to Carlton

As noted above, Carlton successfully bid $2 million for the Property. The Property contains one commercial space on the ground floor and basement and nine rent-stabilized residential apartments, including one duplex apartment. The terms of sale ("Terms of Sale") agreed to at the Foreclosure Sale provided, *inter alia*, that the Property was

> sold in 'as is' physical order and condition subject to:
>
> *   *   *
>
> e.) any rights of tenants or persons in possession of the premises;
>
> f.) [p]rior lien(s) of record which can not be extinguished in a foreclosure action of record, if any.

(Terms of Sale ¶ 9). At the time of the Foreclosure Sale, the only commercial tenant had a fifteen-year lease that expired in 2010. (Carlton Brief Ex. 7). The Debtor and Carlton dispute whether the residential units were fully occupied by tenants with valid leases at the time of the sale. Carlton has strenuously asserted in this Court and in the Tax Foreclosure Action that the Debtor fraudulently back-filed residential leases and that

many of the residential tenants did not reside in those units either prior to or after the Foreclosure Sale. The Debtor claims the tenants had valid, rent stabilized leases.

This Court entered an order on March 7, 2006, modifying the automatic stay "to permit the continuation and completion of the pending State Court reargument and appellate process . . ." with respect to the pending efforts to vacate the Tax Foreclosure Judgment. Thereafter, the Debtor moved in the State Court to stay the closing of the Foreclosure Sale pending its appeal. On April 18, 2006, the Debtor and Carlton entered into a State Court-ordered stipulation (the "Stay Stipulation") providing that the Debtor "is directed to file an undertaking dedicating its interest in surplus monies for purposes of obtaining a CPLR 5519 Stay. However such stay and undertaking will only become effective upon approval of such surplus fund dedication by the Bankruptcy Court...." The Stay Stipulation did not specify to what subsection of CPLR 5519 it referred.

Pursuant to the Stay Stipulation and after a motion by the Debtor, this Court, on May 24, 2006, authorized the Debtor to "dedicate its interest in surplus monies for the purpose of obtaining a CPLR 5519 Stay in the State Court Action" (the "Sale Surplus Order"). Again, no subsection of § 5519 was specified. On April 26, 2006, Krstic executed an affidavit of undertaking (the "Undertaking") so dedicating the Debtor's interest in the surplus funds to be generated in the Foreclosure Sale. The Undertaking also did not specify the subsection of CPLR 5519 to which it referred.

The stay pending appeal and the Stay Stipulation remained effective, with intervening extensions by the State Court, while the Debtor pursued its unsuccessful appeals. The final step took place on October 20, 2008, when the United States

Supreme Court denied the Debtor's petition for a writ of certiorari.[3]

On March 25, 2009, a closing of the Foreclosure Sale was held, title to the Property was transferred to Carlton, Carlton paid the balance of the purchase price over the downpayment, and the net surplus in sale proceeds in the amount of the $1,934,048.90 was deposited with the Clerk of the Supreme Court (the "Sale Surplus"). The Sale Surplus was subsequently transferred to the New York City Commissioner of Finance (the "Commissioner") to hold as custodian. The Debtor commenced an adversary proceeding before this Court, Adv. No. 09-01368, for turnover of the Sale Surplus. The adversary proceeding was settled by stipulation which provided that the Sale Surplus would be held in escrow by the Debtor and that any party claiming an interest in the Sale Surplus would be required to file a Property Proof of Claim (the "Distribution Stipulation"). The Distribution Stipulation stated that

> [T]he release of the Sale Surplus shall be without prejudice to any claim any party might have asserted in a proceeding before the State Court for the distribution of the Sale Surplus under RPAPL §§ 1361 & 1362…. In determining the validity and priority of each Property Proof of Claim, this Court shall consider and give effect to any priority such claim would be entitled to in a Distribution [Stipulation].

(Distribution Stipulation ¶¶ 3, 9). On November 20, 2009, Carleton filed a Property Proof of Claim in the amount of $1,737,411 inclusive of interest (the "Carlton Proof of Claim"). The Carlton Proof of Claim includes damages in the amount of $922,500 for the commercial space and $796,518.80 for the residential units related to the Debtor's possession of the Property during the stay period. (Carlton Proof of Claim ¶¶ 14, 23.) On September 23, 2009, Nason also filed a "Property Proof of Claim," which amended

---

[3] *See NYCTL 1999-1 Trust v. 114 Tenth Avenue Assoc. Inc.*, 845 N.Y.S.2d 235, 44 A.D.3d 576, (1st Dep't 2007), *app. dismissed*, 10 N.Y.3d 757, 853 N.Y.S.2d 540 (2008), *reh'g denied*, 10 N.Y.3d 883, 860 N.Y.S.2d 479 (2008), *cert. denied*, 129 S. Ct. 458 (2008).

her prior proof of claim.  The Property Proof of Claim asserts a $400,000 interest relating

to the Mortgage, plus attorney's fees, in the Sale Surplus.

## DISCUSSION

### I.      The Nason Claim

The Debtor has objected to Nason's claim on the principal ground that the State

Court Stipulation is invalid under State Law and that, as a consequence, the Mortgage

granted under the State Court Stipulation is unenforceable.  The Debtor also contends that

the Mortgage is invalid due to lack of consideration.

### A.      Validity of the State Court Stipulation

The Debtor first argues that the State Court Stipulation, and therefore the

underlying Mortgage, is invalid and unenforceable due to failure to include in the State

Court Stipulation certain disclosures required by the New York Child Support Standards

Act (the "CSSA"), Family Court Act § 413.  Section 413(1)(h) of the CSSA provides, in

part:

> A validly executed agreement or stipulation voluntarily entered into
> between the parties after the effective date of this subdivision presented to
> the court for incorporation in an order or judgment shall include a
> provision stating that the parties have been advised of the provisions of
> this subdivision and that the basic child support obligation provided for
> therein would presumptively result in the correct amount of child support
> to be awarded . . . .  Such provision may not be waived by either party or
> counsel.

There is no dispute that the State Court Stipulation does not comply with the disclosure

requirements of the CSSA.  The Debtor takes the position that this means that the State

Court Stipulation is void *ab initio* and that all provisions thereof, including those relating

to the Mortgage, are unenforceable.  Nason counters that the State Court Stipulation is a

valid, final and enforceable order of the State Court that has never been appealed or

9

vacated, and further that the provisions relating to the Mortgage are unrelated to child support.

There is no need or basis for this Court to consider any issues relating to the validity of the child support provisions of the State Court Stipulation. While the State Court Stipulation deals with the payment of child support, it also contains a number of distinct provisions, including those relating to the Mortgage, the property to be contributed by Krstic for use in Nason's plant store business, and custody of Zillian. These matters do not fall under the rubric of child support and are not covered by the disclosure requirements of the CSSA.[4]

Case law cited by the Debtor makes the foregoing principle clear, stating that only provisions dealing with "basic child support" are affected by the failure of a settlement stipulation to include the CSSA disclosures. *See Baranek v. Baranek*, 54 A.D.3d 789, 791, 864 N.Y.S.2d 94, 96 (2d Dep't 2008). As stated in a recent decision,

> [t]he invalidity of the basic child support obligation, due to a deviation from the CSSA standards . . . does not necessarily require that the entire stipulation be vacated. That a portion of an agreement may be invalid and unenforceable does not necessarily preclude the enforcement of other portions of an agreement . . . The determination as to which additional aspects, if any, of the parties' stipulation must be vacated along with the basic child support provision depends on the circumstances of the particular case and the nature of the obligations addressed in the other provisions of a stipulation. Some provisions may be so directly connected or intertwined with the basic child support obligation that they necessarily must be recalculated along with the basic support obligation.

*Cimons v. Cimons*, 53 A.D.3d 125, 129, 861 N.Y.S.2d 88, 91 (2d Dep't 2008).

The fact that the provisions of the State Court Stipulation relating to the Mortgage are not "connected or intertwined" with the separate basic child support obligation is

---

[4] The definition of child support under the CSSA is "a sum to be paid . . . for care, maintenance and education of any unemancipated child under the age of twenty-one years." Family Ct. Act § 413(1)(b)(2).

confirmed by proceedings in the State Court.  Krstic has attempted on several occasions

to induce the State Court to invalidate the State Court Stipulation in its entirety and undo

each of its provisions, with no success.  The Family Court Support Magistrate has

expressly refused to do so.  *See e.g.,* Family Court Hr'g Tr. 32: 14-25, Jan. 27. 2009.

Moreover, Krstic's Family Court attorney, describing the action of the Magistrate,

implicitly conceded that the Magistrate has found that the provisions of the Stipulation

relating to child support are distinct from the provisions relating to the Property.  In a

declaration filed in this Court on October 26, 2009, counsel stated:

> Magistrate Loughlin has said on the record that she would be issuing a
> written decision that matters beyond child support are beyond her power
> to enforce, and that such matters must be enforced in another forum.
> Consistent with that ruling, Magistrate Loughlin is conducting a trial de
> novo on child support and related matters, but is not permitting the parties
> to address any issues relating to the Property.  Based on Magistrate
> Loughlin's oral rulings and conduct of the trial de novo, I do not believe
> that the Family Court will decide the validity of the Purported Stipulation
> or any issues with regard to the Property.

(Medina Decl., ¶¶ 33-35).  Under applicable State law, the provisions of the State Court

Stipulation relating to the Mortgage are not invalid or unenforceable because of failure to

contain the CSSA disclosures.

### B.    Debt and Consideration Underlying the Mortgage

The Debtor's remaining argument is that the Mortgage is invalid because it fails

to secure an underlying debt of the Debtor and was not issued for consideration.  The

Debtor relies on the principle that "a mortgage is not valid and enforceable unless there is

an underlying valid debt or obligation for which the mortgage is intended as security."

*Coronet Capital Co. v. Spodek*, 265 A.D.2d 292, 292, 696 N.Y.S.2d 191, 192 (2d Dep't

1999) (internal citations omitted).

The simple answer to the Debtor's argument is that the Mortgage in this case is supported by consideration. The Partition Action was brought against the Debtor as well as Krstic. The State Court Stipulation unequivocally requires that the Partition Action be withdrawn (State Court Stipulation ¶ 10), and it was. Forbearance from pursuing an action has been found by the New York courts to constitute adequate consideration for an obligation. *C & D Dev. Inc. v. Sea Breeze Development, LLC*, 60 A.D.3d 610, 611, 874 N.Y.S.2d 560, 562 (2d Dep't 2009).

The Debtor makes a series of arguments regarding the merits of the Partition Action, asserting that the contentions of Nason in that action were "frivolous." None can prevail over the presence of an enforceable settlement agreement. As the New York Court of Appeals has stated,

> [s]trong policy considerations favor the enforcement of settlement agreements. . . . A negotiated compromise of a dispute avoids potentially costly, time-consuming litigation and preserves scarce judicial resources; courts could not function if every dispute devolved into a lawsuit. Moreover, there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed. Additionally, a settlement produces finality and repose upon which people can order their affairs. These interests are advanced only if settlements are routinely enforced rather than becoming gateways to litigation . . . Consequently, the law does not erect insuperable barriers to the creation of binding agreements. To constitute sufficient consideration, for example, a party need only have a good-faith belief in the merit of its position . . . *That the party's view of the law might ultimately prove meritless does not undermine the validity of the agreement* . . . Indeed, if the rule were otherwise, there would be little incentive to enter into a compromise.

*Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383, 624 N.E.2d 995, 604 N.Y.S.2d 900 (1993) (internal citations omitted) (emphasis added).

In a related argument, the Debtor contends that the Mortgage does not secure a specific debt of the Debtor to Nason, as opposed to a debt from Krstic to Nason.

12

Admittedly, the corporation never signed a note for the $400,000 fixed amount of the

obligation.  The Debtor was not an express signatory of the State Court Stipulation,

which was between Nason and Krstic.  However, the Debtor signed the Mortgage, and

even if there were no obligation broader than the related security interest, the security

interest would nonetheless be valid as nonrecourse debt.  The Bankruptcy Code

recognizes nonrecourse debt, where a security interest is given to secure an obligation

without any personal liability on the part of the grantor of security.  Moreover, § 1111(b)

of the Bankruptcy Code provides that such debt is presumptively treated as recourse debt

in a Chapter 11 case.[5]  The Second Circuit has held that this provision is broadly

applicable, that "the absence of contractual privity between the lienholder and the debtor

does not deprive the lienholder of the benefits and protections of § 1111(b)" and that a

lienholder's "lien against property of the Debtors' estate is a 'claim' against the Debtors

within the meaning of the Bankruptcy Code . . . While the lien, absent bankruptcy, is a

nonrecourse claim against the debtor's property for the entire amount of the mortgage,

under §1111(b) the lien is treated as giving [the lienholder] recourse against the Debtors

---

[5] Section 1111(b) provides:

> (1)(A)  A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless-
> (i)  the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
> (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
> (B)  A class of claims may not elect application of paragraph (2) of this subsection if -
> (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
> (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
> (2)  If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

13

irrespective of [the lienholder's] rights under non-bankruptcy law." *680 Fifth Ave. Assoc. v. Mutual Benefit Life Ins. Co. (In re 680 Fifth Ave. Assoc.)*, 29 F.3d 95, 98 (2d Cir. 1994) (internal citations omitted).  Under the circumstances of this case, the principles on which § 1111(b) is based confirm that the Mortgage should be recognized.

Indeed, a New York court has applied similar principles to find that a mortgage that conveys a benefit to the sole shareholder of a corporation can in certain circumstances constitute a valid debt of the corporation itself.  In *Zurlin v. Hotel Levit, Inc.*, 5 A.D.2d 945, 172 N.Y.S.2d 427, 429 (3d Dep't 1958), a brother and sister were the sole stockholders of the corporation in question.  The sister bought out her brother, becoming the sole stockholder, and a mortgage was given by the corporation to secure the purchase price of the stock.  An argument that the mortgage had been given without consideration was rejected, and the Court found that

> here the mortgage was consented to and executed by the sole stockholder.
> No rights of then existing creditors were involved. The sole stockholder
> was the equitable owner of the corporate property, and, under the
> undisputed circumstances present here, was free to dispose of or incumber
> it as she saw fit. Sadie Goldman, as sole stockholder, not only executed
> her formal consent to the mortgage, but she executed it as president of the
> corporation. The corporation may not repudiate a mortgage which it has
> not questioned for approximately nine years, for the benefit of its sole
> stockholder when that sole stockholder would be estopped from denying
> the validity of the mortgage.

*Id.* at 946.  The circumstances are similar in this case, where the Trust Agreement specifically states that Krstic, as sole shareholder of the Debtor, caused the Debtor to execute the Mortgage.  (Trust Agmt. Art. 2).

Based on the foregoing, Nason would be entitled to a distribution from the Sale Surplus before Krstic could receive any recovery as the holder of the Debtor's stock.  In

14

this case the Debtor is not seeking to set aside the Mortgage for the benefit of other creditors as a preference or fraudulent conveyance. Nor could it do so.[6] The Debtor has satisfied or will easily satisfy all other creditors in full; as discussed below, this appears to include Carlton, and there is no serious dispute that the Debtor is and always has been solvent. Nason's claim therefore would have priority over Krstic's stock interest.

For the reasons set forth above, Nason is entitled to a distribution from the estate in the sum of $400,000 and attorney's fees.[7]

## II.    The Carlton Claim

The Debtor has objected to Carlton's claim on a number of grounds. The Debtor argues that Carlton cannot assert a claim for use and occupancy and waste under CPLR 5519(a)(6) because the stay was obtained by court order pursuant to CPLR 5519(c). The Debtor claims the Court should consider the rents and profits actually received rather than the use and occupancy based on fair market value as the proper measure for any damages suffered by Carlton as a consequence of the stay. The Debtor also argues that this Court must make an equitable determination and

---

[6]Although the Mortgage is unrecorded, the Debtor has not sought to avoid the Mortgage under the strong-arm powers of § 544(a) of the Bankruptcy Code. The Debtor is barred from pursuing such an avoidance action because the Debtor would be doing so solely for its own benefit. *Vintero Corp. v. Corporacian Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740 (2d Cir. 1984); *Adelphia Trust v. Bank of America, N.A (In re Adelphia Communications Corp.)*, 390 B.R. 80 (Bankr. S.D.N.Y. 2008).

[7] As noted above, the Court previously dealt with an adversary proceeding that the Debtor had brought against Nason. The principal issue was Nason's abortive effort to file the Mortgage, but Count II contained the Debtor's demand for a declaration that the Mortgage was invalid. Nason sought summary judgment dismissing that claim, and a hearing was held on Nason's summary judgment motion on February 26, 2009. After colloquy with counsel, it was decided that the summary judgment motion would be denied without prejudice, the Court having concluded that all issues could be dealt with in the context of an objection to Nason's proof of claim. In the colloquy, the Court questioned whether Nason held a debt of the Debtor, and the Debtor has now taken these comments out of context to contend that the Court should adhere to its earlier "finding" that Nason has no claim. The Court never made such a ruling, and any prior comments were made on an incomplete record and were expressly without prejudice to further proceedings. Even if they constituted law of the case, and they did not rise to that status, they would not be binding. *See Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 60 (Bankr. S.D.N.Y. 2004), citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912).

consider imputed interest on the purchase price Carlton was relieved from paying during the stay.  Lastly, the Debtor claims that even if the Court holds an evidentiary hearing, Carlton will be unable to prove any damages. The parties previously stipulated that the determination of Carlton's claim would be bifurcated into two stages: (1) a determination of liability and, if necessary, (2) a determination of damages.

A.    **Stay Pursuant to CPLR § 5519**

Carlton bases its claim on the premise that the Debtor obtained the stay as of right pursuant to CPLR 5519(a)(6) and that, therefore, the measure of its damages is fixed by that subsection and includes use and occupancy at a market rate during the years the appeal was pending.  CPLR 5519(a)(6) provides in part that a party may obtain a stay without a court order where:

> [T]he appellant or moving party is in possession or control of real property which the judgment or order directs to be conveyed or delivered, and an undertaking in a sum fixed by the court of original instance is given that the appellant or moving party will not commit or suffer to be committed any waste and that if the judgment or order appealed from, or any part of it, is affirmed, or the appeal is dismissed, the appellant or moving part shall pay the value of use and occupancy of such property, or the part of it as to which the judgment or order is affirmed, from the taking of the appeal until the delivery of possession of the property; if the judgment or order directs the sale of mortgaged property and the payment of any deficiency, the undertaking shall also provide that the appellant or moving party shall pay any such deficiency.

The Debtor argues, to the contrary, that the Stay Stipulation could not have been granted under 5519(a)(6) but was instead granted under CPLR 5519(c), which provides in substance that a court from which an appeal is taken may, in its discretion, pending appeal, stay all proceedings to enforce the judgment or order appealed from in a case not provided for by CPLR 5519(a) or (b).[8]  The Stay Stipulation indicates that the Stay was

---

[8] CPLR 5519(c) states:

issued under CPLR 5519 but does not specify under which subsection.

As discussed below, it is not at all clear that the measure of Carlton's damages, if any, would differ whether the stay was issued under CPLR 5519(a)(6) or CPLR 5519(c). However, it is perfectly clear that the Debtor could not have obtained the stay as of right under CPLR 5519(a)(6), and that the stay was granted under CPLR 5519(c). Once the Debtor filed its Chapter 11 petition, the Sale Surplus became property of the estate. Under § 541(a)(1) of the Bankruptcy Code, the filing of a petition in bankruptcy creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." Surplus funds from a pre-bankruptcy New York State foreclosure sale are property of the estate under § 541(a) of the Bankruptcy Code. *In re Brown*, 734 F.2d 119, 124 (2d Cir. 1984). There is no dispute that the liens on the Property have always been substantially less than the purchase price at the Foreclosure Sale, providing the Debtor with a clear contingent interest in the Sale Surplus.[9]

As property of the estate, the Sale Surplus could not have been pledged as collateral for damages suffered by the respondent during a pending appeal without the

---

The court from or to which an appeal is taken or the court of original instance may stay all proceedings to enforce the judgment or order appealed from pending an appeal or determination on a motion for permission to appeal in a case not provided for in subdivision (a) or subdivision (b), or may grant a limited stay or may vacate, limit or modify any stay imposed by subdivision (a), subdivision (b) or this subdivision, except that only the court to which an appeal is taken may vacate, limit, or modify a stay imposed by paragraph one of subdivision (a).

[9] In *Brown*, the Second Circuit also found that the surplus was property of the estate notwithstanding the fact the money had been transferred to a State court commissioner for distribution to creditors. The Court reasoned that § 541(a)(3) of the Bankruptcy Code includes within its definition of property of the estate, any property of the debtor, or the proceeds thereof, recovered from a custodian of the debtor's property. The State court commissioner, who had a duty under State law to hold the funds for the benefit of interested parties, was found to come within the definition of a "custodian" under the Bankruptcy Code. 734 F.2d. at 124. In this regard, as noted above, the Debtor previously sought and received turnover of the Sale Surplus from the Commissioner, who had held the funds as custodian for the State Court for the benefit of interested parties. In resolving that matter, the Distribution Stipulation provided that the Sale Surplus would be placed in the Debtor's counsel's escrow account and distributed by this Court, applying principles of State law.

approval of this Court.  Bankruptcy Code § 364(c) enables a debtor to grant a security

interest in property of the estate, but only with Court approval after notice and a hearing.

In the Sale Stipulation, the State Court expressly conditioned the effectiveness of the Sale

Stipulation and the Undertaking upon the approval of this Court.  Accordingly, on April

28, 2006, the Debtor moved in this Court to have the Undertaking approved, and the Sale

Surplus Order was entered on March 24, 2006.  Only then was the stay in place that

permitted the Debtor to proceed with its appeal.

    Had this Court refused to grant the Sale Surplus Order, the Debtor could not have

stayed the closing.  *See In re Rodgers*, 333 F.3d 64 (2d Cir. 2003).  By virtue of its

bankruptcy, the Debtor forfeited the ability to act without  a Court order under CPLR

5519(a)(6) and the Stay was necessarily granted under CPLR 5519(c).

    Carlton nonetheless contends that the Debtor is judicially estopped from arguing

that the stay was not issued under § 5519(a)(6) because it initially sought the stay under

CPLR 5519(a) and later represented to the State Court that it had received the stay under

that section during the appeals process.  There is no basis for applying the doctrine of

judicial estoppel.  The rule of judicial estoppel "generally prevents a party from

prevailing in one phase of a case on argument and then relying on a contrary argument to

prevail in another phase." *Zedner v. United States*, 547 U.S. 489 (2006), quoting *New

Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  The doctrine is equitable and several

factors are typically required:

> First, a party's later position must be clearly inconsistent with its earlier
> position.  Second, courts regularly inquire whether the party has succeeded
> in persuading the court to accept that party's earlier position .… A third
> consideration is whether the party seeking to assert the position would
> derive an unfair advantage or impose an unfair detriment on the opposing
> party if not estopped.

*Zedner*, 547 U.S. at 504. Application of these factors confirms that the Debtor did not persuade the State Court to grant the stay as a matter of right. Furthermore, the Court finds that such a position would not impose an unfair detriment on Carlton. Any damages Carlton suffered as a result of the Stay were secured by the Sale Surplus, and Carlton has been able to file a proof of claim for such damages.

### B.    Measure of Damages

Because the Stay was granted under CPLR 5519(c), the reference to use and occupancy in CPLR 5519(a)(6) is not directly relevant. Carlton nevertheless claims that whether the Stay was obtained as of right or pursuant to a court order, the proper measure of Carlton's damages is the market value of the Property during the applicable period, which it argues is the same as use and occupancy. The Debtor contends the appropriate measure is the net rents and profits actually received from its management of the Property. The Court rejects both positions. Under New York State law, the proper measure of damages during the period Carlton was prevented from closing on the foreclosure is the rent that the Debtor should have collected in accordance with the existing commercial and residential leases, less the costs of maintaining the Property, subject to any claim that the Debtor's management constituted waste or negligent mismanagement.[10]

New York Real Property Actions and Proceedings Law ("RPAPL") § 601 provides:

> In an action to recover the possession of real property, the plaintiff may recover damages for withholding the property, including the rents and profits or the value of the use and occupation of the property for a term not

---

[10] Indeed, at one point, Carlton virtually concedes that such a measure of damages can also be categorized as "use and occupancy." (Carlton Brief p. 22-23).

> exceeding six years; but the damages shall not include the value of the use of any improvements made by the defendant or those under who he claims.

This is the measure of damages applied in cases involving judicial sales of property under New York law. *H. Syol Construction Co. v. New York*, 92 Misc.2d 238, 399 N.Y.S.2d 1006 (Ct. Cl. 1977). It reflects a general rule formulated as early as 1868 by the New York Court of Appeals:

> The general rule, that the vendor will be regarded as trustee of the land for the benefit of the purchaser, and liable to account to him for the rents and profits, or, if himself an actual occupation of the premises, charged with the value of the use, is not inflexible; and a court of equity will regard the special circumstances of the case, wherever there are peculiarities which render the rigid application of any general rule unsatisfactory.

*Worrall v. Munn*, 38 N.Y. 137 (1868). The rule is applied as an equitable remedy in specific performance actions because it places the parties in the same position as if the contract had been performed according to its terms. *Id.* at 142. For example, in *Freidus v. Eisenberg*, 123 A.D.2d 174, 510 N.Y.S.2d 139 (2d Dep't 1986), the Court held that a seller, who had wrongfully remained in possession of property, did not guarantee profits to the buyer, and that the buyer's recovery was limited to use of the land as it was rather than potential profits based on the purchaser's planned development. *See also Bostwick v. Beach*, 105 N.Y. 661, 663, 12 N.E. 32 (1887); *4200 Ave K. Corp v. 4200 Realty Co.*, 123 A.D.2d 419, 506 N.Y.S.2d 723 (2d Dep't 1986); *Cohn v. Mezzacappa Bros., Inc.*, 155 A.D. 2d 506, 547 N.Y.D.2d 367 (2d Dep't 1989); *Fried v. Bolanos*, 231 A.D.2d 824, 647 N.Y.S.2d 62 (3d Dep't 1996).

In mortgage foreclosure actions, similar principles apply. For example, in *Gasco Corp. & Gordian Group of Hong Kong, Inc. v. Tosco Properties Ltd.*, 236 A.D.2d 510, 653 N.Y.S.2d 687 (2d Dep't. 1997), the Court found in a mortgage foreclosure action

that where a mortgagee takes possession of the premises, the mortgagee collects the rents

and profits and acts as a quasi-trustee or bailiff for the mortgagor.  The mortgagee is

charged with the rents and profits it would have earned only if failure to do so is

attributable to fraud or willful default.  *Id.* at 512; *see also Bank for Savings of the City of*

*New York v. Shenk Realty and Construction Co.,* 265 A.D. 72, 37 N.Y.S.2d 597 (1 Dep't

1942) (where a receiver appointed in a tax foreclosure action was only entitled to receive,

as rent, the sum agreed to by the landlord and tenant under a bona fide agreement);

*Jacobs v. Andolina*, 123 A.D.2d 835, 507 N.Y.S.2d 450 (2d Dep't 1986).

Carlton's argument that it is entitled to damages based on the difference between

rent received and the fair market value of the Property during the Stay Period is

principally based on its citation to New York statutes and cases granting landlords use

and occupancy for a period of holdover subsequent to the termination of a lease.  *See,*

*e.g.*, RPAPL § 220[11]; *438 W. 19th St. Operating Corp v. Metro. Oldsmobile, Inc.*, 142

Misc. 2d 170, 536 N.Y.S.2d 669 (Civ. Ct. 1989); *Beacway Operating Corp. v. Concert*

*Arts Soc.*, 123 Misc. 2d 452, 474 N.Y.S.2d 727 (Civ. Ct. 1984).  However, even apart

from the general principles set forth above, Carlton's reliance on the above-referenced

cases is misplaced because the instant case is not analogous to a tenant holding over

beyond the end of a lease term.  *See Geist v. New York*, 3 Misc. 2d 714, 156 N.Y.S.2d

183 (Ct. Cl. 1956) (where a vendor of real property remains in possession of the premises

after the conveyance, he does not thereby become a tenant of the purchaser).

---

[11] In New York, the statutory measure of damages prescribed in landlord tenant cases is different from the
measure of damages used in cases involving sales.  RPAPL § 220 provides:

> The landlord may recover reasonable compensation for the use and occupancy
> of real property by any person, under an agreement, not made by deed; and a
> parol lease or other agreement may be used as evidence of the amount to which
> he is entitled.

At the time of the Foreclosure Sale, the Debtor was not a tenant of Carlton but was acting as a vendor in possession who had leased the Property to tenants, collected rent, paid taxes, and operated the Property.  Pursuant to the Terms of Sale, Carlton purchased the Property subject to the existing leases and rights of the tenants.  (Terms of Sale ¶ 9(e)).  As indicated by the cases cited above, courts do not require payment either for rent or for use and occupation beyond the sums to which the owner would have been entitled under valid and binding leases.  The leases remained viable contracts which Carlton knew or should have known about at the time of the purchase, and the Debtor was required to honor those leases.  *See Davis v. Cole*, 3 Misc. 2d 380, 387, 747 N.Y.S.2d 722, 728 (Sup. Ct. 2002).

On the basis of the foregoing, Carlton's claim is limited to the rents actually received during the period of the stay less all reasonable expenses relating to the Property,[12] subject to one *caveat*.  As the New York courts recognize and as the Debtor does not seriously dispute, Carlton may still recover any damages in the nature of waste as a consequence of mismanagement of the Property.   *Pheonix Mut. Life Ins. Co. v. Tuddington Holding Corp.*, 249 App.Div. 766, 291 N.Y.S. 1012 (2d Dep't 1936) (finding that a mortgagee in possession may be charged with the loss of rent if the loss is due to his fraud or negligence); *see also Gasco Corp. & Gordian Group of Hong Kong, Inc. v. Tosco Properties Ltd.*, 236 A.D.2d at 512; *Aetna Life Ins. Co. v. Avalon Orchards, Inc.*, 118 A.D.2d 297, 505 N.Y.S.2d 216 (3d Dep't 1986) (finding that a mortgagee in

---

[12] The Debtor and Carlton appear to agree that any measure of damages should include deductions for expenses necessary to maintain the Property.  This includes expenses for maintenance, janitorial services and real estate taxes.  The only issue of dispute stems from the Debtor's attorney's fees in connection with the litigation and bankruptcy disputes with the commercial tenant.  Generally, the expenses of a collecting agent or other representative are not included in the costs of upkeep and repairs.  *See Dime Sav. Bank of Brooklyn v. Altman*, 275 N.Y. 62, 9 N.E.2d 778 (1937).  Therefore, the Debtor's attorney's fees relating to those disputes will not be deducted with the other expenses from the rents received.

possession was bound, while it controlled the property, to use reasonable means to preserve the property from loss and injury and to conserve its value.)  The issues that Carlton has raised relative to waste or negligent mismanagement must be considered separately with respect to the commercial and residential leases.

### C.    The Commercial Lease

The commercial lease was a fifteen-year lease that expires on August 31, 2010. (Carlton Brief Ex.7).  There has been no showing that the commercial tenant's rights were altered as a result of the Foreclosure Sale.  Carlton does not dispute the validity of the lease or claim that it did not purchase the Property subject to such a lease.  On the basis of the authority cited above, the rent required by the lease is *prima facie* the measure of damages, less expenses related to the leased space.

Carlton and the Debtor, however, both dispute that this is the appropriate measure.  Carlton asserts that the Debtor should have paid the tenant to "go away" or should have negotiated other alternatives.  This ignores the fact that the commercial tenant was in a bankruptcy proceeding in this Court on two occasions during the period. (*In re SB&T Corp.*, Case No. 07-10098 (JMP) and 08-11824 (JMP)).  On the instant record, Carlton's hypothesis that the Debtor could have ignored the rights of the commercial tenant under both the Bankruptcy Code and State law is the rankest speculation.  On the other hand, the Debtor's contention that it should be liable only for the rents and profits actually received because the commercial tenant filed bankruptcy during the period of the stay and was delinquent on rent ignores Carlton's assertion that the Debtor's management of the Property amounted to waste.

The Carlton Proof of Claim, which asserts $922,000 in damages based on a

monthly market value of $22,500 related to the commercial space, is plainly wrong.  The

proper place to start is the monthly rent provided for in the lease. (Carlton Proof of Claim

¶16).[13]  The total collectible rent for the commercial space during the forty-one months

appears to have been $353,817.89.  From this amount should be subtracted the expenses

related to the space, less any further adjustments for collectability, including issues that

may be relevant because the tenant was a debtor in the bankruptcy cases.  Further

proceedings will be necessary to determine the appropriate rent that should have been

collected and the deductible expenses.

#### D.        The Residential Units

The issues relating to the residential units are different.  The Carlton Proof of

Claim asserts a claim of $796,518 based on the alleged fair market value of the space,

with the tenants removed and the apartments decontrolled and subject to no regulation at

all.  This is not a serious starting point.  The residential units all appear to be rent

stabilized and subject to Department of Housing and Community Renewal ("DHCR")

regulations, with rents limited by the Rent Stabilization Law.  Carlton has made

numerous allegations both here and in various State court proceedings that the Debtor

fraudulently back-filed its annual registrations with the DHCR and signed fraudulent

leases with tenants.  In fact, the Carlton Proof of Claim attached an order to show cause

that it filed in State Court against the Debtor seeking possession of the apartments and

making specific allegations about the Debtor's misconduct with respect to each

---

[13] Schedule A of the commercial lease provides that the monthly rent during each year remaining on lease, with the year beginning September 1, is as follows:

> 2005-2006, $7,038.66
> 2006-2007, $8,082.96
> 2007-2008, $9,295.40
> 2008-2009, $10,698.71

(Carlton Brief Ex.7).

residential unit.

Whatever the facts may be with respect to the residential units, the issues involve the interests of tenants under the Rent Stabilization Law and otherwise.  Unlike the commercial lease, which expires on August 31, 2010, the tenants' occupancy is ongoing and may be protected under State Law.  Some or all of the issues also appear to be subject to State court proceedings.  Under the circumstances, if Carlton seeks to measure its damages by any amount other than lawful regulated rent subject to DHCR limitations, Carlton should establish its relief in State Court, presumably with the tenants as additional parties.

28 U.S.C. 1334(c)(1) provides that nothing prevents a bankruptcy court "in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  This is a particularly appropriate case for abstention.  The issues relating to the residential leases are complex and the State courts have great expertise in applying them.  *Taub v. Hershkowitz  (In re Taub)*, 417 B.R. 186 (Bankr. E.D.N.Y. 2009).  They involve the rights of third parties, and Carlton has already brought some of its issues relating to the residential units to the State Court.  The State Court is the appropriate tribunal to decide all issues relating to residential units, and the Court abstains in its favor.

### E.    Use of Funds (Interest)

Finally, there must be an offset for the benefit Carlton gained by not paying the full purchase price during the Stay Period.  New York recognizes the longstanding equitable principle that at a vendee may not claim both the profits related to the

ownership of property (such as rents) and also have the use of the purchase money price.

*See Worrall*, 38 N.Y. 137 (1868); *see also Bostwick*, 105 N.Y. 661 (1887).  During the

stay, Carlton enjoyed use of the $2.0 million purchase price, less a $210,000 down

payment.  Any recovery for its losses sustained during that time should be offset by

interest on the purchase price.  *See Cobble Hill Nursing Home, Inc. v. Henry & Warren

Corp.*, 196 A.D.2d 564, 601 N.Y.S.2d 334 (2d Dep't 1993) (finding that even where a

seller caused the delay in the sale, a purchaser, as trustee holding the purchase money,

was liable for interest accruing on the purchase price).[14]

The Debtor has requested that the Court apply the 18 percent interest rate

referenced in the Terms of Sale.  (Terms of Sale ¶ 3(b)).  However, the Terms of Sale

only impose an 18 percent interest rate if the Referee, in his sole discretion, extends the

time for completion of the purchase. *Id*. ¶ 3.  Given that the delay was a result of a stay,

and that this Court is enjoined to apply State law, the New York statutory rate of nine

percent is the appropriate interest rate.  *See* CPLR § 5004; *Abir v. Malky, Inc*., 59 A.D.3d

646, 873 N.Y.S.2d 350 (2d Dep't 2009).  Based on a nine percent annual interest rate on

$1.79 million held for forty-one months, the charge to Carlton would apparently be in the

amount of approximately $613,500.[15]

## CONCLUSION

For the reasons set forth above, Nason is entitled to distribution from the Sale

Surplus in the principal sum of $400,000, plus attorneys fees.[16]  Carlton is entitled to

---

[14] Although this case is not one seeking specific performance between a buyer and seller, New York courts
have found that the rules that govern risk of loss between buyer and seller are applicable in judicial sales of
property.  *H. Syol Constr. Co. Inc.,* 92 Misc. 2d 238 (1977).
[15] The forty-one month period began when the Debtor filed its appeal on November 1, 2005, through the
time of the closing on March 25, 2009.  The nine percent simple interest is compounded annually.
[16] The Mortgage provides that "in any action…in which it becomes necessary to defend or uphold the lien
on this mortgage, all sums paid by the mortgagee for the expense of litigation…(including reasonable

recover, from the Sale Surplus, the rent to which the Debtor was entitled under the commercial lease, less any necessary expenses, less any damages attributable to waste.  If the Debtor proposes to demonstrate that it could not collect the lease rent, despite commercially reasonable efforts, a hearing will be necessary.  Similarly, Carlton is entitled to a hearing if it proposes to show that the Debtor's management of the commercial space amounted to waste.  As to the residential units, any issues relating to the lawfulness of any rent charged to and payable by any tenant, and to the right of possession of any tenant, should be decided by the State courts.  Any recovery by Carlton should be offset by imputed interest on the purchase price, less the down payment.

Separate orders should be settled by counsel for Nason and Carlton on ten days notice if the parties cannot agree on the form of orders.  The Carlton orders should contain detailed calculations relating to rents, expenses and interest and specify what issues remain to be determined.  The surplus after the payment of all bankruptcy claims and expenses will continue to be held until all issues raised by Carlton are decided by this Court or the State Court.

Dated: New York, New York
       March 31, 2010


        */s/ Allan L. Gropper*
        UNITED STATES BANKRUPTCY JUDGE

---

counsel fees), shall be paid by mortgagor…and shall be deemed secured by this mortgage." (Mortgage ¶ 11).